# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: MARCH 25, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0604-MR

HUMBERTO MESA-VASQUEZ A/K/A                 APPELLANT
ALEJANDRO ARTURO VASQUEZ CABRERA


                ON APPEAL FROM PULASKI CIRCUIT COURT
V.                   HONORABLE DAVID A. TAPP, JUDGE
                  NO. 18-CR-00235-001


COMMONWEALTH OF KENTUCKY                 APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

A Pulaski Circuit Court jury convicted Humberto Mesa-Vasquez a.k.a. Alejandro Arturo Vasquez Cabrera ("Mesa-Vasquez") of murder,[1] arson in the second degree,[2] tampering with physical evidence,[3] and abuse of a corpse.[4] He was sentenced to life in prison. Mesa-Vasquez now appeals as a matter of right, arguing multiple points of error. *See* KY. CONST. Section 110(2)(b). After careful review of the record and arguments of the parties, we affirm the Pulaski Circuit Court.

---

[1] Kentucky Revised Statute ("KRS") 507.020.

[2] KRS 513.030.

[3] KRS 524.100.

[4] KRS 525.120.

## I. BACKGROUND

In the early morning hours of February 24, 2018, Jorge Martinez was shot and killed in the living room of the upstairs apartment of 431 South Main Street in Somerset, Kentucky. In the apartment at the time Martinez was killed were Mesa-Vasquez, Heberto Romero Ordonez I ("Senior"), and Heberto Romero Ordonez II ("Junior"). Mesa-Vasquez, Senior, and Junior all lived in the apartment, and Martinez lived just a few houses away on the same street. Martinez, Senior, and Junior also worked together in the roofing industry for Desi Fuentes. Mesa-Vasquez and Junior are cousins.

Junior testified at trial[5] that the evening before Martinez was killed, he, Senior, and Martinez all went to Desi's house to pick up their pay checks. They then purchased beer at a gas station and went back to the apartment at 431 South Main Street. At the apartment, all four of the men were socializing and drinking beer. At some point, Martinez and Senior went back out and purchased more beer. Senior eventually fell asleep on a couch, and Mesa-Vasquez went into his bedroom. Junior and Martinez were still in the living room when Mesa-Vasquez exited his bedroom and shot Martinez. Mesa-Vasquez shot three times, once into the floor, once into Martinez's chest, and once into Martinez's head. Junior could not remember exactly what Mesa-

---

[5] By the time Mesa-Vasquez's case went to trial, Senior had been deported to Mexico. The only witnesses to any portion of the events in question who testified at trial were Junior and Gloria Ortega, Mesa-Vasquez's ex-girlfriend. Both were also indicted as co-defendants and reached plea agreements with the Commonwealth.

2

Vasquez said before shooting Martinez but stated that the two were not arguing before the shooting.

After shooting Martinez, Mesa-Vasquez called Gloria Ortega, his ex-girlfriend, and told her to come to his apartment. Mesa-Vasquez instructed her to back her Chevrolet Tahoe into the driveway in front of the apartment. According to Junior, Mesa-Vasquez wrapped Martinez's body in a sheet, and when Ortega arrived, he and Mesa-Vasquez placed the body in the back of the Tahoe. Mesa-Vasquez then got into Martinez's car while Junior got into Ortega's car. Mesa-Vasquez led Ortega and Junior to Ortega's house. Ortega testified that when they arrived at her house, Mesa-Vasquez asked for two bags, and both men walked around in her garage and her yard for a while as if they were looking for something. She did not know what they were doing. Eventually, both men got back into the car in which they drove to Ortega's house. Mesa-Vasquez led Ortega and Junior to a rural area of Somerset. They stopped at an area on Rush Branch Road. According to Junior, Mesa-Vasquez ordered him to place Martinez's body in the driver's seat of Martinez's car. Junior did so, and then Mesa-Vasquez poured gasoline on the body and the car and lit them on fire. Ortega then brought both men back to the apartment they shared, and she returned home.

Junior testified that Mesa-Vasquez then disposed of the chair in which Martinez was shot. While Mesa-Vasquez was disposing of the chair, Senior and Junior went to Desi Fuestes's home and told Desi what had occurred. Desi's wife, Estelle Fuestes, then called 911 to report the murder. Junior explained

3

during his testimony that he went to Desi's house to report the crime because neither he nor his father spoke English to call 911 themselves.

At approximately 6:30 a.m., Mary Elizabeth Hamm was driving down Rush Branch Road on her way to work when she saw a car on fire. She called 911, and multiple fire departments and the police department responded. After the fire was put out, firefighters discovered Martinez's body in the driver's seat of the car. According to lab testing, charred remnants of fabric taken from Martinez's body and the front seat of the vehicle tested positive for gasoline. The medical examiner found a projectile lodged in Martinez's skull and testified that the rest of the body was too burnt for him to be able to tell if Martinez suffered another through-and-through gunshot wound. The medical examiner testified that the gunshot to the head caused Martinez's death.

By approximately 9:30 a.m., Mesa-Vasquez, Junior, and Senior had been taken into custody. Pursuant to a search warrant, police searched the men's apartment. Police noticed cleaning supplies at the top of the stairs near the apartment and a gas can under the stairs. Inside of the apartment, police recovered four empty shell casings, one in the bedroom Junior and Senior shared and the rest in the living room. Police officers found a projectile lodged in the floor of the living room. They also recovered a live .25 caliber round from the closet in Mesa-Vasquez's bedroom.

Police officers also went to Ortega's home. There, they found a .25 caliber handgun buried in two plastic bags in Ortega's yard. They also viewed her

4

Tahoe and found that the back, cargo area appeared to have recently been cleaned.

Lab testing revealed Martinez's blood on Mesa-Vasquez's shirt, pants, and shoes. None of Junior's or Senior's clothes were sent for DNA testing to determine whether they too had Martinez's blood on them. Mesa-Vasquez's, Junior's, and Senior's hands all tested positive for gunshot residue.

After the case was presented to the grand jury, Junior and Ortega were both indicted on the charges of complicity to arson in the second degree, complicity to tampering with physical evidence, and complicity to abuse of a corpse. Prior to Mesa-Vasquez's trial, both Junior and Ortega reached plea agreements with the Commonwealth to resolve their charges. Junior entered an *Alford*[6] plea to complicity to tampering with physical evidence. Ortega pled guilty to complicity to tampering with physical evidence and received a three-year sentence. Mesa-Vasquez was indicted on murder, arson in the second degree, tampering with physical evidence, and abuse of a corpse. He proceeded to a trial by jury where he was found guilty of all charges. He was then sentenced to life in prison.

Mesa-Vasquez appeals his conviction to this Court, asserting four claims of error. First, he argues that the Commonwealth improperly shifted the burden to the defense. Second, he argues that the trial court erred when it refused to instruct the jury on tampering with physical evidence as a lesser offense of arson in the second degree. Third, he argues that the trial court

---

[6] *North Carolina v. Alford*, 400 U.S. 25 (1970).

erred in admitting evidence that Ortega was scared of him. Finally, he argues that the trial court erred in denying his motion for a directed verdict on the charge of murder. After a careful review, we affirm the judgment of the Pulaski Circuit Court.

## II. ANALYSIS

### A. The Commonwealth did not improperly shift the burden to the defense.

Mesa-Vasquez first argues that his right to due process and a fair trial was violated when the Commonwealth asked two of its witnesses whether the defense had requested that any additional items be tested at the Kentucky State Police crime lab and whether the lab would test items upon defense request. He argues that these questions shifted the burden of proof to the defense.

Detective Larry Patterson was the lead detective in the case. He testified that the Kentucky State Police lab only allows law enforcement to submit ten items at a time for DNA testing. He stated that he chose the ten items he did because he thought they were the best items to help corroborate the statements he had received from witnesses. The Commonwealth asked Detective Patterson whether he received any requests for additional testing, which he answered in the negative. The Commonwealth then asked if he had received requests for additional testing from either the Commonwealth or the defense in other cases, and Detective Patterson answered in the affirmative. No objection was made to this testimony, and Mesa-Vasquez asks that we review

6

this portion of his argument under our palpable error standard found in Rule of Criminal Procedure ("RCr") 10.26.[7]

Taylor Hare, a serologist at the Kentucky State Police crime lab, testified that she tested fluids found on Mesa-Vasquez's clothing and shoes to determine if the fluid was likely human blood and therefore suitable for DNA testing. The Commonwealth asked Hare if she ever received requests from the Commonwealth or the defense to do additional testing. Defense counsel objected and argued to the trial court that this question shifted the burden of proof to the defense. Because of the contemporaneous objection, this portion of Mesa-Vasquez's argument is preserved. The trial court overruled the objection, citing primarily to *Ordway v. Commonwealth*, 391 S.W.3d 762 (Ky. 2013).

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Little v. Commonwealth*, 272 S.W.3d 180, 187 (Ky. 2008). A trial court abuses its discretion only where its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Kentucky Revised Statute ("KRS") 500.070 states that "[t]he Commonwealth has the burden of proving every element of the case beyond a reasonable doubt." Further, this Court has been clear that because "the presumption of innocence mandates that the burden of proof and production

---

[7] "A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." RCr 10.26.

fall on the prosecution, any burden-shifting to a defendant in a criminal trial would be unjust." *Butcher v. Commonwealth,* 96 S.W.3d 3, 10 (Ky. 2002).

In *Ordway*, cited by the trial court, the Commonwealth's Attorney, in his closing argument, stated, "You see the defense has just as much access to the Kentucky State Police crime laboratory as the prosecution. They can ask anything they want to be examined by the Kentucky State Police." 391 S.W.3d at 796. Ordway argued that this statement by the Commonwealth was improper and shifted the burden of proof to the defense. We, however, held that the argument was proper, stating,

> The defense is, in fact, entitled to inspect and test evidence, either through its own experts or by request to the State Police Lab for assistance where applicable. *McGregor v. Hines,* 995 S.W.2d 384, 387 (Ky. 1999) ("a defendant's right to test possible exculpatory evidence is as fundamental to the assurance of due process as is his right to test inculpatory evidence, if not more so."). Nor did these arguments impermissibly shift the burden of proof from the Commonwealth to the defendant.

*Id.*

Mesa-Vasquez attempts to distinguish *Ordway* from the case before us on two primary bases. First, he points out that Ordway put forth a self-defense defense during trial. Self-defense is an affirmative defense that places some burden of proof on the defendant. *See* KRS 500.070(3) ("The defendant has the burden of proving an element of a case only if the statute which contains that element provides that the defendant may prove such element in exculpation of his conduct."). Mesa-Vasquez, on the other hand, asserted an actual innocence defense, which places absolutely no burden on the defendant.

8

This Court has recently dealt with a similar issue in *Mulazim v. Commonwealth*, 600 S.W.3d 183 (Ky. 2020). In *Mulazim*, the defendants were charged with robbery and tampering with physical evidence and put forth an actual innocence defense. *Id.* at 187. During its closing argument, the Commonwealth commented on "the defense's ability to investigate by contacting the robbery victims." *Id.* at 193. Defense counsel objected, arguing that the Commonwealth's statement shifted the burden of proof from the Commonwealth to the defense. *Id.* at 193-94. The trial court overruled the defense objection. *Id.* at 194. We found no error in the trial court's ruling, concluding that the Commonwealth's comment did not burden-shift, but "merely suggested, correctly, that the defense is permitted to seek information from victims and witnesses." *Id.* We went on to say,

> Clearly, the prosecutor did not state that defense investigators have the burden (or obligation) to talk to the victims and failed to do so here. The comments focused on by Appellants merely touched briefly on the defense's own ability to investigate, an important point given the defense's criticism of both the police investigation and the witnesses' allegedly changing memories regarding the robbers.

*Id.*

The same can be said in this case. The Commonwealth's questions to Detective Patterson and Hare did not act to shift the burden of proof to the defense. They merely pointed out that the defense had the ability to ask that additional testing be completed by the state crime lab and yet chose not to do so. The fact that Mesa-Vasquez put forth an actual innocence defense, as

9

opposed to a self-defense defense, is not sufficiently distinguishable from *Ordway* to justify departure from *Ordway*'s sound legal analysis.

Mesa-Vasquez also attempts to distinguish his case from *Ordway* because in his case, the questions came during the Commonwealth's case-in-chief, as opposed to during the Commonwealth's closing argument as in *Ordway*. We find this distinction unpersuasive as well. The fact that the questions were asked during the Commonwealth's case-in-chief would likely be less prejudicial to the defense, as it provides the defense with an opportunity to respond to the questions that it would not have if the argument was merely made in closing argument.

For these reasons, we remain steadfast to our holding in *Ordway* that questions and argument about the defense's ability to have items tested at the Kentucky State Police crime lab are proper and do not impermissibly shift the burden from the Commonwealth to the defense. Accordingly, the trial court did not err in admitting this evidence.

**B. The trial court did not err when it refused to instruct the jury on tampering with physical evidence as a lesser offense of arson in the second degree.**

Mesa-Vasquez next argues that the trial court erred in refusing to instruct the jury on tampering with physical evidence as a lesser offense of arson in the second degree. This argument was preserved by defense counsel's tendering of the requested instruction to the trial court. *See* RCr 9.54; *Elery v. Commonwealth*, 368 S.W.3d 78, 89 (Ky. 2012). We review the trial court's

refusal to give a specific jury instruction for an abuse of discretion. *Sargent v. Schaffer*, 467 S.W.3d 198, 204 (Ky. 2015).

We review a trial court's decision not to give the jury an instruction on a lesser offense under two principles:

> (1) it is the duty of the trial judge to prepare and give instructions on the whole law of the case . . . [including] instructions applicable to every state of the case deducible or supported to any extent by the testimony; and (2) although a defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury on proper instructions, the trial court should instruct as to lesser-included offenses only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense.

*Holland v. Commonwealth*, 114 S.W.3d 792, 802 (Ky. 2003) (internal citations and quotation marks omitted). KRS 505.020(2)(a) allows a defendant to be "convicted of an offense that is included in any offense with which he is formally charged. An offense is so included when: (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged." This Court, in *Hall v. Commonwealth*, rejected a strict same-elements test for determining whether a defendant is entitled to a lesser offense instruction and instead adopted a fact-based approach. 337 S.W.3d 595, 607-08 (Ky. 2011).

Mesa-Vasquez argues that he was entitled to an instruction on tampering with physical evidence as a lesser offense of arson in the second degree. He argues that the elements of tampering with physical evidence are less than all the elements of arson in the second degree. To further support his argument,

11

he points to testimony from Ortega that she had previously told members of the defense team that Junior lit the fire, that Mesa-Vasquez vomited as Junior lit the fire, and that Junior threw something out of her car window on the drive back to the apartment, which Mesa-Vasquez posits were the keys to Martinez's car. He argues that if the jury believed Ortega's testimony over Junior's testimony, "the jury could not give effect to [this belief] absent the lesser-included instruction."

In this case, we need not get to the question of whether tampering with physical evidence is a proper lesser offense of arson in the second degree because, under the facts as presented at trial, no reasonable juror could have a reasonable doubt as to Mesa-Vasquez's guilt of arson in the second degree and yet believe beyond a reasonable doubt that he is guilty of tampering with physical evidence. Under KRS 513.030(1)(a), "[a] person is guilty of arson in the second degree when he starts a fire or causes an explosion with intent to destroy or damage a building...[o]f another." The definition of a "building" includes an "automobile." KRS 513.010. Conversely,

> [a] person is guilty of tampering with physical evidence when, believing that an official proceeding is pending or may be instituted, he: (a) Destroys, mutilates, conceals, removes or alters physical evidence which he believes is about to be produced or used in the official proceeding with intent to impair its verity or availability in the official proceeding.

KRS 524.100(1)(a).

The jury had two versions of events it could believe. The first came from Junior's testimony. If the jury believed this version, it would believe that Mesa-Vasquez poured gasoline on Martinez's body and car and then set them on fire.

12

Under this version of events, no reasonable juror could find Mesa-Vasquez not guilty of arson, and yet guilty beyond a reasonable doubt of tampering with physical evidence. The alternative version of events came from Ortega's statements to the defense investigator. If the jury believed this version, it would believe that Junior set the car and body on fire while Mesa-Vasquez vomited. Under that version of events, Mesa-Vasquez would not be guilty of either arson or tampering with physical evidence for the destruction of the car and body.

It is clear after reviewing the record, that under the two versions of events presented to the jury, no reasonable juror could have a reasonable doubt as to Mesa-Vasquez's guilt of arson in the second degree and yet believe beyond a reasonable doubt that he is guilty of tampering with physical evidence. Accordingly, the trial court did not err in refusing to instruct the jury on tampering with physical evidence as a lesser offense of arson in the second degree.

### C. No reversible error occurred in the admission of evidence that Gloria Ortega was scared of Mesa-Vasquez.

Mesa-Vasquez next argues that the trial court erred in admitting evidence that Gloria Ortega was afraid of him. Specifically, Mesa-Vasquez argues that the Commonwealth failed to give proper notice of this "other bad act" evidence under Kentucky Rule of Evidence ("KRE") 404(c) and that it was inadmissible under KRE 404(b).

Approximately four months before trial, Mesa-Vasquez filed a peremptory motion to exclude all KRE 404(b) evidence, as the Commonwealth had not yet provided notice of its intent to introduce any evidence under the rule. The

13

Commonwealth's Attorney assured both defense counsel and the trial court that if he decided to introduce any evidence under the rule, he would provide the appropriate notice. No notice was ever filed by the Commonwealth.

During trial, the Commonwealth elicited testimony from Ortega that she was afraid of Mesa-Vasquez. Because the specific questions asked, Ortega's answers, the objections raised, and the arguments made are vital to appropriately analyzing this issue, we will describe these things in detail.

During the Commonwealth's direct examination of Ortega, the Commonwealth's Attorney asked Ortega why she was not honest with the police at the beginning of the investigation. The exchange went as follows:

> Commonwealth's Attorney ("CW"): Why, when the police first came, why were you not honest at the beginning?
>
> Ortega: Out of fear
>
> CW: Fear of what?
>
> Ortega: Fear. I mean, I don't know how to explain it to you. Just fear. I have never had any problems. This is my first time being involved in anything like this.
>
> CW: Are you afraid of Mr. Mesa-Vasquez?

At this point, defense counsel objected, but her objection was not acknowledged by anyone in the courtroom, including the judge. We can only assume the objection was not heard, at least not by the trial court. The testimony went on as follows:

> Ortega: Yes.
>
> CW: Why are you afraid?
>
> Ortega: Because he is aggressive. Violent.

14

CW: Have you ever previously had to move because of him?

At this point, defense counsel objected again. The trial court stopped the testimony and asked counsel for both sides to approach the bench. A bench conference ensued where the trial court asked the Commonwealth to explain the relevance of its last question. The bench conference focused on whether evidence that Ortega had, at one point, moved into a domestic violence shelter as a result of Mesa-Vasquez's actions was admissible. The final exchange between the trial court and the Commonwealth's Attorney went as follows:

> Trial Court ("TC"): She has already testified that she was afraid. I don't see why it is relevant where she went.
>
> CW: I believe the testimony will also reveal that after he was arrested, she visited him. Out of fear she continued to keep up good relations for fear there would be reprisal.
>
> TC: You can ask about that. But I agree with you [defense counsel] regarding the prejudicial effect versus what probative value it has. I think you [Commonwealth] have gotten most of it in already, so I think we can avoid a potential issue on appeal by stopping it at this point. But you can ask her generally about being afraid, but I don't want to elicit that she went to [a domestic violence shelter] …. Ask your next question and we will see if that draws an objection.

At no point during this exchange did defense counsel object to the admission of evidence that Ortega was afraid of Mesa-Vasquez. After the bench conference, the Commonwealth's first question to Ortega was, "Based on your past with Mr. Mesa-Vasquez, did you have concerns about keeping up good relations, keeping him from getting angry?" She answered in the affirmative, again with no objection by defense. She then acknowledged visiting him at the jail after he

15

was arrested. She stated she did so out of "humaneness" and so that she would have something to tell his family in Mexico.

> This Court has long held that

> > the appellant has the duty to make timely objections and if he wants to preserve his issues for review by this court the objections must be specific enough to indicate to the trial court and this court what it is he is objecting to…. Also, if an objection is made, the party making the objection must insist that the trial court rule on the objection.

*Bell v. Commonwealth*, 473 S.W.2d 820, 821 (Ky. 1971) (internal citations omitted). In this case, the only contemporaneous objection made to the evidence that Ortega was afraid of Mesa-Vasquez was not ruled upon by the court, nor did defense counsel insist upon a ruling. As such, Mesa-Vasquez's argument on this issue is unpreserved, and any error will only merit reversal of his conviction if it rises to the level of palpable error. *See* RCr 10.26.

We review a trial court's decision to admit prior bad acts evidence for an abuse of discretion. *Commonwealth v. King,* 950 S.W.2d 807, 809 (Ky. 1997). A court abuses its discretion if its decision "was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Clark v. Commonwealth,* 223 S.W.3d 90, 95 (Ky. 2007).

KRE 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may be admissible "[i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b)(1). It may also be admissible if it is "so inextricably intertwined with other evidence essential to

16

the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(2). KRE 404(b) is exclusionary in nature. *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994).

In order to determine if other bad acts evidence is admissible, the trial court should use a three-prong test: (1) Is the evidence relevant for a purpose other than criminal disposition? (2) Is the evidence of the other bad act sufficiently probative of its commission by the accused to warrant its introduction into evidence? (3) Is its probative value substantially outweighed by its prejudicial effect? *Purcell v. Commonwealth*, 149 S.W.3d 382, 399-400 (Ky. 2004); *Parker v. Commonwealth*, 952 S.W.2d 209, 214 (Ky. 1997).

In this case, the Commonwealth argues that evidence of Ortega's fear of Mesa-Vasquez is relevant to explain why she assisted him on the day of the murder and why she lied to the police during their initial investigation. In *Commonwealth v. Wilson*, we acknowledged that a "witness's fear may well stem from the [defendant]'s prior bad acts, implicating KRE 404(b), but . . . impeachment is a purpose other than propensity to engage in misconduct which can render collateral 'bad acts' evidence relevant." 438 S.W.3d 345, 349 (Ky. 2014) (citing *Trover v. Estate of Burton*, 423 S.W.3d 165 (Ky. 2014)). We noted that

> the determination of witness credibility is the jury's responsibility. To that end, KRE 104(e) permits a party "to introduce before the jury evidence relevant to weight or credibility, including evidence of bias, interest, or prejudice." This Court has held that because witness credibility is "always at issue ... relevant evidence which

17

> affects credibility should not be excluded." And, of course, our
> rules expressly allow a party to impeach the credibility of that
> party's own witness.

*Id.* (internal citations omitted). Finally, we held that "[f]ear can affect a witness's testimony and, thus, if a witness has reason to fear someone about whom the witness is testifying, evidence of that fear is admissible for impeachment purposes." *Id.* (citations omitted).

In this case, the Commonwealth did not offer evidence of Ortega's fear of Mesa-Vasquez for impeachment purposes, but instead did so, in part, to anticipatorily rehabilitate her, as her statements prior to trial were more favorable to Mesa-Vasquez than was her trial testimony. A similar issue was raised in *McDaniel v. Commonwealth*, 415 S.W.3d 643 (Ky. 2013). In *McDaniel*, a witness's identification at trial of the defendant as the person who shot him was significantly more certain than was his identification just a few days after the shooting. *Id.* at 650. The Commonwealth "attempted to anticipatorily rehabilitate [the witness]'s credibility by eliciting testimony from him that the uncertainty expressed during [the pretrial identification procedure] was rooted in a fear of retaliation." *Id.* In analyzing the admissibility of this evidence, we noted that in *Parker v. Commonwealth*, 291 S.W.3d 647, 658 (Ky. 2009), we held that "[o]rdinarily, a witness's statement that he fears retaliation for testifying is improper." *Id.* at 650-51. We then explained our *Parker* holding further:

> As previously mentioned, in *Parker,* this Court held that
> threat evidence is improper when it invites the jury to render a
> verdict based on the vengeful nature of the defendant rather than

18

> the established arguments and facts of the case. *Parker,* 291 S.W.3d at 658. Essentially, the rule of *Parker* is that evidence of threats is not admissible to prove a violent or vengeful propensity. *Parker* 's holding tracks KRE 404(b)'s prohibition against evidence of other crimes when offered to "prove the character of a person in order to show action in conformity therewith."

*Id.* at 651. We acknowledged that we had previously not "specifically considered whether threat evidence may be admissible if offered for a purpose other than proving a vengeful propensity," but that "other courts have found that it is admissible if relevant to explain a witness's inconsistent statements." *Id.* (citing *United States v. Thadsamany,* 305 Fed.Appx. 942, 944 (4th Cir. 2009); *United States v. Thomas,* 86 F.3d 647, 654 (7th Cir. 1996); *United States v. Qamar,* 671 F.2d 732, 734–36 (2d Cir. 1982); *Brown v. United States,* 952 A.2d 942, 947 (D.C. 2008); *State v. Mayhorn,* 720 N.W.2d 776, 783 (Minn. 2006)). We then specifically held that "threat evidence may be admitted if it serves to aid the jury in resolving a witness credibility issue," and noted in a footnote that "[t]his ruling comports with KRE 404(b)(1), which allows evidence of other crimes 'if offered for some other purpose' other than to prove propensity." *Id.* Consistent with our holding in *McDaniel,* the evidence that Ortega was afraid of Mesa-Vasquez was relevant to a purpose other than to prove Mesa-Vasquez's criminal disposition.

We next must determine whether the evidence of the other bad act was sufficiently probative of its commission by the accused to warrant its introduction into evidence. *Parker,* 952 S.W.2d at 214. In this case, Ortega testified that she was afraid of Mesa-Vasquez because he was violent and

19

aggressive. Only limited evidence was offered to counter this opinion evidence of Ortega. As such, the evidence of Ortega's fear of Mesa-Vasquez was sufficiently probative to warrant its admission into evidence.

Finally, the "central issue … is the balance of probativeness and prejudice." *Id.* The potential prejudice from this type of evidence may be great. *Id.* However, in this case, the potential prejudice is lessened by the other testimony provided by Ortega. Specifically, Ortega testified that she was fearful after the incident, at least in part, because she had never been involved in anything like this before. Also, she testified that she visited Mesa-Vasquez at jail after this arrest out of humaneness, as opposed to doing so out of fear of him. Further, the probative value was high because it impacted Ortega's credibility. The evidence helped to explain why she helped Mesa-Vasquez on the day of the murder and why she initially was not cooperative with the police. Accordingly, there was no abuse of discretion in admission of the evidence under the three-prong test.

However, the Commonwealth's Attorney failed to provide notice of his intent to introduce this evidence under KRE 404(c), even after assuring the trial court and defense counsel at a pretrial hearing that he would provide the required notice under the rule if he decided to introduce any KRE 404(b) evidence. Although defense counsel acknowledged that discovery provided by the Commonwealth included a statement by Ortega that she lived in a domestic violence shelter for a period of time, it is unclear whether Ortega's fear of Mesa-Vasquez was also included in discovery. Because a contemporaneous objection

20

was not made to the admission of this evidence at trial, arguments about notice were not made. Even if the appropriate notice was not given, any error related to the admission of this evidence does not rise to the level of palpable error.

To determine if an error is palpable, "an appellate court must consider whether on the whole case there is a substantial possibility that the result would have been any different." *Commonwealth v. McIntosh,* 646 S.W.2d 43, 45 (Ky. 1983). To be palpable, an error must be "easily perceptible, plain, obvious and readily noticeable." *Burns v. Level,* 957 S.W.2d 218, 222 (Ky. 1997) (citing *Black's Law Dictionary* (6th ed. 1995)). A palpable error must be so grave that, if uncorrected, it would seriously affect the fairness of the proceedings. *Ernst v. Commonwealth,* 160 S.W.3d 744, 758 (Ky. 2005). "It should be so egregious that it jumps off the page ... and cries out for relief." *Chavies v. Commonwealth,* 374 S.W.3d 313, 323 (Ky. 2012) (quoting *Alford v. Commonwealth,* 338 S.W.3d 240, 251 (Ky. 2011) (Cunningham, J., concurring)). Any error in the admission of the evidence that Ortega was afraid of Mesa-Vasquez does not rise to the level of palpable error. Given the strength of the other evidence against Mesa-Vasquez, there is no substantial possibility that the result of the trial would have been any different if the evidence had been excluded.

## D. The trial court did not err in denying Mesa-Vasquez's motion for a directed verdict on the charge of murder.

Finally, Mesa-Vasquez argues that the trial court erred in denying his motion for a directed verdict on the charge of murder. This argument is preserved by his motion for a directed verdict at the close of the evidence.

Our directed verdict standard has been firmly established in *Commonwealth v. Benham*:

> On a motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purposes of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony. On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

816 S.W.2d 186, 187 (Ky. 1991). In assuming that the evidence for the Commonwealth is true, the Court does so "regardless of whether the evidence, usually testimony, has been attacked or impeached." *Southworth v. Commonwealth*, 435 S.W.3d 32, 42 (Ky. 2014).

Mesa-Vasquez argues that the Commonwealth's case was built on an impermissible stacking of inferences. "No doubt, *unreasonable* inferences are barred by our law. Additionally, inferences cannot be drawn from other inferences drawn *ad infinitum*." *Southworth v. Commonwealth*, 435 S.W.3d 32, 45 (Ky. 2014) (citing *Briner v. General Motors Corp.*, 461 S.W.2d 99, 102 (Ky. 1970)). However, in this case, assuming the evidence for the Commonwealth is

22

true regardless of whether the evidence was impeached, the jury was not required to draw *any* inferences to find Mesa-Vasquez guilty of murder. Junior provided direct, eye-witness testimony that Mesa-Vasquez fired three gunshots, two of which hit Martinez, one of which, according to the medical examiner, was the cause of death. This testimony alone was sufficient to induce a reasonable juror to believe beyond a reasonable doubt that Mesa-Vasquez was guilty of murder. Accordingly, the trial court did not err in denying Mesa-Vasquez's motion for a directed verdict.

### III.  CONCLUSION

For the foregoing reasons, we affirm the judgment of the Pulaski Circuit Court in this matter.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Julia Karol Pearson
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel J.  Cameron
Attorney General of Kentucky

Robert Lee Baldridge
Assistant Attorney General